**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                 Case No.: 3:15-cr-167-J-32MCR

TODD MARTIN DORSETT

_____/

**REPORT AND RECOMMENDATION**[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Evidence and Statements (the "Motion") (Doc. 27), and the Government's response (the "Response") in opposition to the Motion (Doc. 35). An evidentiary hearing was held before the undersigned on April 20, 2016.[2]

**I.   Background**

On October 29, 2015, the grand jury returned a two-count indictment against Defendant charging him with unlawfully manufacturing more than 1,000 marijuana plants and unlawfully possessing marijuana with the intent to distribute, in violation 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), and 841(b)(1)(c).  (Doc. 1.)

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

[2] At the hearing, counsel for the parties requested an opportunity to file supplemental briefs on a discovery issue, which was granted.  Those briefs (Docs. 43 and 44) were also taken into consideration by the undersigned.

On March 21, 2016, Defendant filed the instant Motion seeking to suppress any evidence seized during a search of Defendant's residence and premises on September 23, 2015.  (Doc. 27.)  On May 23, 2016, the Court granted Defendant's motion to continue the status conference and trial in this matter.  (Doc. 46.)  The status conference is now set for July 18, 2016, and trial is set for the trial term commencing on August 1, 2016.  (*Id.*)

## II.     Evidence Presented at the Hearing

On September 23, 2015, the Columbia County Sheriff's Office ("CCSO") investigated a potential marijuana grow operation located at 1357 SW Wilson Springs Road in Fort White, Florida (the "Wilson Springs Property").[3]  (Doc. 40 at 57; Def. Ex. 1A; Doc. 36-1 at 3.)  Prior to this investigation, CCSO received information from another law enforcement officer with the Suwannee County Sheriff's Office that Defendant potentially had a marijuana grow operation on the Wilson Springs Property.  (Doc. 40 at 7-8, 57.)  Upon receiving this information, Richard Conger, a detective with CCSO, performed a records search and obtained a report indicating a 2011 arrest of, and/or charge against, Defendant for growing marijuana at the Wilson Springs Property. (Doc. 40 at 8; Doc. 41 at 60.)  CCSO Detective and DEA Task Force Officer Ronald Slade McCardle was also aware of Defendant's prior arrest and/or charge for marijuana grow

---

[3] The undersigned refers to the Government's exhibits as "Govt. Ex. __" and Defendant's exhibits as "Def. Ex. __."

operations at the Wilson Springs Property. (Doc. 41 at 5.) CCSO decided to further investigate the Wilson Springs Property subsequent to receiving the tip and information regarding the 2011 marijuana grow incident involving Defendant at that location.

Detective Conger, Detective McCardle, and CCSO Detective William Porter made up a key part of the September 23, 2015 investigative team. Detectives Conger and McCardle were tasked with performing surveillance of the Wilson Springs Property, and Detective Porter's role was to stay in a parked car down the street and to be a point of relay for the detectives conducting surveillance. (Doc. 40 at 58-59.)

The Wilson Springs Property is owned (but not occupied) by David Dorsett, Defendant's father. (Doc. 41 at 23.) Defendant was living alone in a trailer on the Wilson Springs Property at the time of the surveillance. (*Id.* at 23, 26, Def. Ex. 1D.) The Wilson Springs Property is a 10-acre lot located in a rural area of Columbia County between Jordan Street and Wilson Springs Road. (Doc. 40 at 29; Doc. 41 at 23; Def. Ex. 1A and 1B.) The Wilson Springs Property is set back from Wilson Springs Road (Def. Ex. 1A and 1B), and is surrounded by a 4-foot, barb wired field fence. (Doc. 40 at 54; Doc. 41 at 26, 45; Def. Ex. 1C, 1N, 1O, 1P.) Typically, an individual desiring to visit the Wilson Springs Property would enter the property by utilizing the Wilson Springs Road entrance. (Doc. 40 at 27-28.) To do so, one would turn off of Wilson Springs Road onto an access road

and would first go through an open gate.  (Doc. 40 at 28; Doc. 41 at 33; Def. Ex. 1A and 1B.)   The open gate grants an individual access to other parcels making up the original, 80-acre tract of land off of Wilson Springs Road, but does not grant an individual access to the Wilson Springs Property.  (Doc. 41 at 33-34.)  To get to the Wilson Springs Property, an individual would have to obtain access through a second gate.  (Doc. 40 at 28; Doc. 41 at 33-34.)  The second gate is kept locked, and only David Dorsett and Defendant have keys to grant access to the Wilson Springs Property.  (Doc. 41 at 33-34.)  "No Trespassing" signs are posted along the second gate and along the fence line at the Wilson Springs Property.  (Doc. 41 at 34.)

    Detectives Conger and McCardle obtained permission from the landowner of the neighboring property to the east of the Wilson Springs Property to perform surveillance.  (Doc. 40 at 9, 29.)  The neighboring landowner did not live on the property and no buildings exist on the neighboring property.  (Doc. 40 at 9, 31.)  At approximately 2:00 p.m. on September 23, 2015, Detectives Conger and McCardle drove through a gate off of Jordan Street, to the northeast of Defendant's property, and entered the neighboring property.  (Doc. 40 at 10-12, 15.)  Detective Conger estimated that the gate off of Jordan Street was approximately one-tenth of a mile from Defendant's property.  (Doc. 40 at 12.)  Detectives Conger and McCardle then traveled south on the neighboring property for approximately 100 yards, and then got out of the vehicle so they could get

through a stand of pine trees in order to obtain a clear vantage point onto Defendant's property. (*Ia.*; Def. Ex. 1A and 1B.) When Detectives Conger and McCardle got to the stand of pine trees, they "laid on the ground and crawled" to Defendant's fence line "to get a vantage point of the greenhouses." (Doc. 40 at 13.) Without crossing Defendant's fence line, Detectives Conger and McCardle started their surveillance of the Wilson Springs Property at approximately 2:30 p.m. (Doc. 40 at 15, 55.)

From their vantage point, Detectives Conger and McCardle had an unobstructed view of a greenhouse covered with a semi-opaque plastic covering. (Doc. 40 at 13, 22, 54; Doc. 41 at 7, 13.) The edge of the covered greenhouse was located 45 ½ feet from the trailer where Defendant lived and 100 feet from the fence line of the surveillance property.[4] (Doc. 41 at 44, 47; Def. Ex. 1Q, 1R, 1S.) The detectives observed two metal-framed structures that appeared to be uncompleted greenhouses. (Doc. 40 at 13; Gov't Ex. 3 and 4.) The detectives also observed two large propane tanks near the uncompleted greenhouses,

---

[4] Without measuring, Detective McCardle estimated that their vantage point was approximately 70 feet from the completed greenhouse. (Doc. 40 at 34; Doc. 41 at 18.) Detective Conger took photographs from where the detectives conducted surveillance showing the outside of the covered greenhouse and relayed those photographs to Detective Porter. (Doc. 40 at 33.) The photographs were not turned over to the Government as the data was lost when Detectives Conger and Porter turned in their cell phones to CCSO. (Doc. 40 at 55; Doc. 41 at 70-71; Doc. 44 at 4, n.2.) Although Defendant argues that the Government's failure to preserve potentially exculpatory photographs shows a lack of credibility on the part of the Government and prejudices Defendant, it is unnecessary for the undersigned to address this issue in light of the result recommended here.

along with large exhaust fans, and what appeared to be a "makeshift" cooling system (consisting of large fans and fiber medium that had plumbing going through it and water dripping over it) located at the other end of the covered greenhouse. (Doc. 40 at 18-20, 22, 49; Doc. 41 at 8-9; Gov't Ex. 3 and 4.) The detectives testified that based on their training and experience, the items they observed were consistent with a marijuana grow operation. (Doc. 40 at 18-19, 22-23; Doc. 41 at 8-9.)

   Because the plastic material covering the greenhouse was only semi-opaque and because the sunlight appeared to be in the detectives' favor on the day of surveillance, the detectives were able to observe the silhouettes, shape, or outline of green plants located within the covered greenhouse. (Doc. 40 at 13, 15, 18-19, 22-23, 36, 53; Doc. 41 at 7-8, 19.) No damaged sections or openings existed on the semi-opaque, plastic greenhouse cover at the time the detectives conducted surveillance. (Doc. 40 at 39; Doc. 41 at 29-30.) Although the detectives testified that tall, green vegetation located within the greenhouse is consistent with marijuana plants, neither detective could definitively identify the vegetation located within the covered greenhouse with an unaided view. (Doc. 40 at 13-14, 37, 42; Doc. 41 at 7-9, 20-21.) Detective Conger conceded that without confirming the identity of the plants as marijuana, the detectives would have insufficient information to obtain a search warrant of the Wilson Springs Property. (Doc. 40 at 42.)

Detectives Conger and McCardle then utilized common binoculars to obtain a closer view of the covered greenhouse.[5]  (Doc. 40 at 14-15, 42-43; Doc. 41 at 9-13.)  With the binoculars, Detectives Conger and McCardle clearly observed marijuana leaves pressed up against the plastic cover from inside of the greenhouse.  (Doc. 40 at 14-15; Doc. 41 at 9-13; Gov't Ex. 10 and 11.)  Detective McCardle relayed his observations to Detective Porter via text message.[6]  (Doc. 40 at 58-59, 62-65.)  Detective Porter returned to his office and drafted a search warrant with the information relayed by Detective McCardle.  (Doc. 40 at 60.)  Notably, the search warrant confirmed Detective McCardle's identification of the marijuana plants, but failed to inform the reader that the identification was obtained through the use of binoculars.[7]  (Doc. 36-1 at 3; Doc. 40 at 72.)

The search warrant was subsequently taken to, and signed by, a state circuit judge in Columbia County that same day.  (Doc. 40 at 64.)  Detective Porter returned to the Wilson Springs Property and executed the search warrant at approximately 5:00 p.m.  (Doc. 40 at 16, 25-26.)  The detectives' search of the Wilson Springs Property revealed, *inter alia*, 165 marijuana plants growing inside of the trailer and over 1,000 marijuana plants growing inside the covered

---

[5] Detectives Conger and McCardle utilized a pair of Vortex, 10 x 42, Waterproof Diamondback binoculars.  (Doc. 41 at 11.)

[6] The text message data was also lost when the detectives turned in their cell phones to CCSO.  (Doc. 44 at 4, n.2.)

[7] The search warrant also described the greenhouse as covered with clear plastic. (Doc. 36-1 at 3; Doc 40 at 69-70.)

greenhouse.  (Doc. 36-2; Gov't Ex. 5-9.)

## III. Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  A search within the meaning of the Fourth Amendment "occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  Whether or not a person who invokes the protection of the Fourth Amendment may claim a "reasonable expectation of privacy" is determined by two inquiries: (1) whether, by his conduct, the person has "exhibited an actual (subjective) expectation of privacy;" and (2) whether that expectation of privacy is "one that society is prepared to recognize as reasonable."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz v. United States*, 389 U.S. 347 (1967) (Harlan, J., concurring)).

While it is well established that a person cannot have a reasonable or justifiable expectation of privacy in things or activities which are generally visible from some public vantage point, *California v. Ciraolo,* 476 U.S. 207, 213 (1986), intimate activities performed within a person's home and curtilage (the land immediately surrounding and associated with the home) are provided Fourth Amendment protection.  *See United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) ("The private property immediately adjacent to a home is entitled to the

same protection against unreasonable search and seizure as the home itself.")

(citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  As explained by the

United States Supreme Court in *Raskas v. United States*, 439 U.S. 128 (1978):

> Legitimation of expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society.  One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

439 U.S. at 143 n.12 (internal citation omitted).  The right of a person to exclude

others extends to the curtilage, as the curtilage has been deemed "the area to

which extends the intimate activity associated with the 'sanctity of a man's home

and the privacies of life.'" *Oliver*, 466 U.S. at 180 (quoting *Boyd v. United States*,

116 U.S. 616, 630 (1886)).

The undersigned finds that Defendant had a subjective expectation of

privacy in the covered greenhouse.  Defendant lawfully controlled the Wilson

Springs Property as he lived in the trailer on the property.  The Wilson Springs

Property, located in a rural area, was set back off the main road.  Access to the

Wilson Springs Property was denied to the average traveler, as the second gate

off of the access road was kept locked by Defendant, and Mr. Dorsett, the owner,

was the sole individual in possession of a key to the gate besides Defendant.

The Wilson Springs Property was surrounded by a barb wired fence, and "No

Trespassing" signs covered the main gate and fence line. The greenhouse, completely covered in semi-opaque plastic, was located 100 feet inside the fence line and 45 ½ feet from the trailer where Defendant lived. This setting does not invite casual intrusion. The detectives' path to surveillance, driving a truck 100 yards south from Jordan Street onto adjacent property, getting out of the truck, and crawling through a stand of pine trees to the fence line, bolsters this point. The location of the trailer and the covered greenhouse is a clear indication of Defendant's expectation of privacy.

The undersigned must next determine whether that expectation of privacy is one that society is prepared to recognize as reasonable. In pursuing this second inquiry, the test is not whether the individual chooses to conceal asserted "private activity," but whether the Government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment. *Ciraolo*, 476 U.S. at 212. As discussed above, protection of privacy in the home (and the areas surrounding the home) strikes at the heart of the Fourth Amendment. As the United States Supreme Court recently explained in *Florida v. Jardines*, 133 S. Ct. 1409 (2013):

> But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if

> the police could enter a man's property to observe his repose from just outside the front window.
>
> We therefore regard the area "immediately surrounding and associated with the home" – what our cases call the curtilage – as "part of the home itself for Fourth Amendment purposes." That principle has ancient and durable roots. Just as the distinction between the home and the open fields is "as old as the common law," so too is the identity of home and what Blackstone called the "curtilage or homestall," for the "house protects and privileges all its branches and appurtenants." This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened."

133 S. Ct. at 1414-15 (internal citations omitted).

Here, it is undisputed that the covered greenhouse constituted curtilage where a reasonable expectation of privacy exists. (*See* Doc. 35 at 6, n.1 ("[T]he government does not contend that the defendant did not have a reasonable expectation of privacy in the searched premises, whether they are classified as part of the curtilage or not. That is the reason the officers sought a search warrant."); Doc. 41 at 63.); *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) ("The 'outer limits of the curtilage' have been expressly defined to be 'the outer walls of the extreme outbuildings of the curtilage.'") (quoting *United States v. Williams*, 581 F.2d 451, 454 (5th Cir. 1978)). However, the Government argues that it did not violate Defendant's expectation of privacy because Detectives Conger and McCardle stood on property where they had a lawful right to be and viewed the marijuana plants in "plain sight" with the use of binoculars.

11

The Government asserts that the detectives were permitted to use regular binoculars, an ordinary investigative tool, to identify the marijuana plants inside of the covered greenhouse in order to provide the basis for a search warrant. (Doc. 41 at 51-58.) The undersigned disagrees.

While the use of binoculars to perform surveillance does not appear to be *per se* unreasonable, "[t]he use of vision enhancing devices can taint an otherwise valid surveillance . . . when the devices allow the observer to view not only activities the homeowner should realize might be seen by unenhanced viewing but also the details of activities the homeowner legitimately expects will not be observed." *United States v. Whaley*, 779 F.2d 585, 591 (11th Cir. 1986). Indeed, "' the reasonableness of an expectation of privacy [is] logically dependent principally . . . on the degree to which the locale is viewable by a member of the public without visual aids.'" *Id.* at 590-91 (quoting *United States v. Taborda*, 635 F.2d 131, 139 n.10 (2d Cir. 1980)).

Here, despite the Government's contentions to the contrary, it is clear that the plants located inside of the covered greenhouse were not in "plain sight," or viewable by a member of the public without visual aids. In fact, Detectives Conger and McCardle confirmed that they could not see with an unaided view what they believed to be marijuana plants and that they required binoculars to essentially peer inside the greenhouse to identify the vegetation as marijuana plants. (Doc. 40 at 13-14, 37, 42; Doc. 41 at 7-9, 20-21.) Consequently, this

case is distinguishable from the cases relied on by the Government holding that binoculars use did not constitute a Fourth Amendment violation where the binoculars merely confirmed that which could be viewed with the naked eye.[8] *See Whaley*, 779 F.2d at 587, 590-92 (holding that the defendant did not have a reasonable expectation of privacy where the defendant conducted illegal activity in a lighted basement directly in front of uncurtained windows where it was undisputed that the activity, described by one agent as "just like watching T.V.," could be viewed with the naked eye from neighboring property adjoining a canal, and where binoculars were used merely to clarify that which could be seen with the naked eye); *United States v. Lace*, 669 F.2d 46, 50 (2d Cir. 1982) (holding that appellants did not have legitimate expectation of privacy in criminal activities viewed with binoculars because outsiders could enter the property at will and the outdoor area between the appellants' house and barn was readily observable by the public from the highway); *United States v. Allen*, 675 F.2d 1373, 1382 (9th Cir. 1980) (holding that "[s]urveillance of the *open fields* on the ranch from the hill

---

[8] The courts appear to place additional emphasis on the fact that a defendant took some affirmative action in connection with the criminal activity while knowing that the action would attract attention to outsiders (*i.e.*, turning on bright lights in darkness). *See, e.g., Whaley*, 779 F.2d at 590 ("[A]ppellant and his coconspirators engaged in illegal activity *in a lighted room* directly in front of uncurtained windows.") (emphasis added); *Fullbright v. United States*, 392 F.2d 432, 434 (10th Cir. 1968) ("When the investigators made their initial observation, the door to the shed was open *and its light was sufficient to reveal what was going on.*") (emphasis added); *see also Florida v. Riley*, 488 U.S. 445, 450 (1989) ("Because the sides and roof of his greenhouse were left partially open, however, what was growing in the greenhouse was subject to viewing from the air . . . Riley could not reasonably have expected the contents of his greenhouse to be immune from examination by an officer seated in a fixed-wing aircraft flying in navigable airspace . . .").

13

observation site and use of binoculars violated no reasonable expectation of privacy of the defendants") (emphasis added); *see also United States v. Cusumano*, 83 F.3d 1247, 1263 n.26 (10th Cir. 1996) (McKay, C.J., dissenting in part and concurring in part) ("I recognize that the use of illumination or binoculars to improve the visibility of an object *already in plain view* has been held constitutional.") (emphasis added).

The undersigned finds the circumstances of this case more closely aligned with cases rejecting an officer's use of an apparatus "to explore details of the home that would previously have been unknowable without physical intrusion." *Kyllo v. United States*, 533 U.S. 27, 40 (2001); *see also United States v. Karo*, 468 U.S. 705, 715 (1984) (holding that officers' monitoring of an electronic device inside the defendant's home was unjustifiable because it "reveal[ed] a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have [been] otherwise obtained without a warrant," as the critical fact "could not have been visually verified"); *Cf. State v. Knight*, 621 P.2d 370, 373 (Haw. 1980) (holding that police intruded on the defendant's expectation of privacy where they used binoculars from a vantage point on neighboring property 100 yards away to see what was in the defendant's greenhouse that was covered by a shade cloth and could not be viewed with the naked eye). Thus, the undersigned concludes that the detectives' use of binoculars to identify objects or activities that could not be identified with the

naked eye constituted an unjustifiable intrusion into a constitutionally protected area and violated Defendant's reasonable expectation of privacy.

Because the detectives used tainted evidence to obtain a search warrant, the question becomes whether the search warrant was valid regardless of the detectives' observations with binoculars.  *See, e.g., United States v. Free*, 254 F. App'x 765, 768 (11th Cir. 2007) ("When some of the evidence in an affidavit is found to have violated the Fourth Amendment, 'if sufficient untainted evidence was present in the affidavit to establish probable cause, the warrant was valid.'") (quoting *Whaley*, 779 F.2d at 589 n.7).  While there may be an argument that the detectives presented sufficient probable cause regardless of the confirmation of marijuana plants, the Government conceded at the hearing that it did not have sufficient probable cause to obtain a search warrant without the confirmation of marijuana plants through the use of binoculars.  (*See* Doc. 40 at 42 (Detective Conger admitting that there would be "insufficient [probable cause] if [he] had not seen marijuana with the use of binoculars"); Doc. 41 at 51-52 (conceding that "but for the use of binoculars, [] there was a lack of probable cause").)  As such, the undersigned will not find that the Government had sufficient probable cause to obtain a search warrant regardless of the confirmation of marijuana plants through the use of binoculars.

### III.     Conclusion

The undersigned finds the Government violated Defendant's reasonable expectation of privacy when utilizing binoculars to determine the contents inside the covered greenhouse that were not visible with the naked eye. Because such violation served as the basis of the search warrant, the search warrant was invalid and all evidence seized as a result of executing that search warrant should be suppressed as "fruits of the poisonous tree."

Accordingly, it is respectfully **RECOMMENDED**:

Defendant's Motion to Suppress (Doc. 27) be **GRANTED** and the evidence obtained upon searching the premises be **SUPPRESSED**.

**DONE AND ENTERED** at Jacksonville, Florida, on May 26, 2015.

*/s/ Monte C. R.*
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record